### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| AFSHIN BAHIRAEI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 22 C 7360 |
| | ) | |
| ANTONY BLINKEN, in his official capacity | ) | Judge Joan H. Lefkow |
| as Secretary of State, United States | ) | |
| Department of State, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION AND ORDER

In this putative class action, plaintiffs challenge the alleged refusal of State Department consular officials to consider whether certain exemptions to "terrorist-related inadmissibility grounds" (TRIG) apply to visa applicants who involuntarily served in the Islamic Revolutionary Guard Corps of Iran (IRGC) under the Iranian system of mandatory military service and conscription. Plaintiffs include former IRGC members who had their visa applications denied and certain of their U.S. citizen or legal permanent resident family members. Pending before the court are plaintiffs' motions for class certification (dkt. 43), preliminary injunction (dkt. 46), and evidentiary hearing (dkt. 70), as well as the government's motion to dismiss for lack of jurisdiction and failure to state a claim (dkt. 59). For the reasons described below, the government's motion to dismiss is granted and the plaintiffs' motions are denied as moot.

### BACKGROUND

I. **Legal Background**

The Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, governs the admission of noncitizens into the United States. Under the INA, a noncitizen seeking to

1

permanently reside in the United States and obtain a path to eventual citizenship must obtain an immigrant visa. *See* 8 U.S.C. §§ 1101(a)(15), 1181(a), 1182(a)(7), 1184(a); *United States* v. *Idowu*, 105 F.3d 728, 731 (D.C. Cir. 1997) ("Nonimmigrant visas are usually issued for short visits, as in the case of tourists and students. Immigrant visas are for permanent residence, which often leads to citizenship.") (quotation marks and citation omitted). The visa-applicant plaintiffs in this case seek admission to the United States as family-sponsored and employment-based immigrants. (Dkt. 34 ¶¶ 16–26); *see* 8 U.S.C. §§ 1151, 1153, 1154.

The process for obtaining an immigrant visa is essentially the same for both family-sponsored and employment-based immigrants. The noncitizen seeking admission bears the burden of establishing eligibility to receive a visa. *See* 8 U.S.C. § 1361; 22 C.F.R. § 40.6. Meeting this burden begins with filing a Form I-130 (for family-sponsored visas) or I-140 (for employment-based visas) with U.S. Citizenship and Immigration Services (USCIS). *See* 8 U.S.C. § 1154(a); 8 C.F.R. §§ 204.2, 204.5(a)–(c). If USCIS approves the petition, the noncitizen may then apply for a visa from the State Department. *See* 8 U.S.C. §§ 1201(a), 1202(a).

As part of this application process, the applicant attends an in-person interview with a State Department consular officer. *Id.* § 1202(e), (h): 22 C.F.R. § 42.62. Following the interview, the consular officer must either issue or refuse the visa. *See* 22 C.F.R. § 42.81(a). If "it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa … under [8 U.S.C. § 1182]" or if the consular officer "knows or has reason to believe that such alien is ineligible to receive a visa[,]" then "[n]o visa or other documentation shall be issued" to the applicant. 8 U.S.C. § 1201(g); *see also* 22 C.F.R. § 40.6. If the visa is refused, "[t]he consular officer shall inform the applicant of the provision of law or implementing regulation on which the refusal is based and of any statutory provision of

law or implementing regulation under which administrative relief is available." 22 C.F.R.

§ 42.81(b); *but see* 8 U.S.C. § 1182(b)(1), (3) (general requirement that consular officers provide

"timely written notice that … lists the specific provision or provisions of law under which the

alien is inadmissible" not applicable to criminal- or security-related grounds of inadmissibility

under 8 U.S.C. § 1182(a)(2), (3), which includes TRIG). If a visa is refused, applicants have one

year to submit additional evidence to overcome the ground of ineligibility without needing to pay

any additional fee. 22 C.F.R. § 42.81(e). If applicants wish to submit new evidence or otherwise

have their application reconsidered after this one-year period elapses, they must reapply and pay

a new application fee. *See id.*; 9 FAM 504.11-4(C) (providing guidance to consular officers that

"a refused applicant need pay no new application fee if evidence is presented overcoming the

ground of ineligibility within one year of the date of refusal" and that "[i]f more than one year

has elapsed … a new application and fee must be *collected* before approval of the case and

issuance of a visa.") (emphasis in original).

One category of inadmissibility—and hence ineligibility to receive a visa—involves

terrorist activity or association with a terrorist organization. *See* 8 U.S.C. § 1182(a)(3)(B). This

category of inadmissibility is generally referred to as "Terrorism-Related Inadmissibility

Grounds" (TRIG). As relevant to this case, a noncitizen who "is a member of a terrorist

organization" or who "has received military-type training … from or on behalf of any

organization that, at the time the training was received, was a terrorist organization" is

inadmissible. *Id.* § 1182(a)(3)(B)(i)(V), (VI), (VIII). The INA defines "terrorist organization" as

an organization:

    (I)        designated under [8 U.S.C. § 1189];

    (II)      otherwise designated, upon publication in the Federal Register, by the
              Secretary of State in consultation with or upon the request of the Attorney
              General or the Secretary of Homeland Security, as a terrorist organization,

after finding that the organization engages in the [terrorist] activities described in [8 U.S.C. § 1182(a)(3)(B)(iv)]; or

(III)    that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the [terrorist] activities described in [8 U.S.C. § 1182(a)(3)(B)(iv)].

8 U.S.C. § 1182(a)(3)(B)(vi). These three categories are referred to as "Tier I, II, or III terrorist organizations," and Tier I terrorist organizations can also be referred to as "Foreign Terrorist Organizations" (FTOs). (Dkt. 34 ¶ 43.) "Unlike Tier I and Tier II terrorist organizations, which are formally designated, adjudicating consular officers determine whether an organization falls within the definition of an undesignated or Tier III terrorist organization on a case-by-case basis." (*Id.*; *see also* dkt. 59-1 at 4.) A consular officer may determine that an organization is a Tier III terrorist organization if it

commits or incites terrorist activity; prepares or plans a terrorist activity; gathers information on potential targets for terrorist activity; solicits funds for a terrorist activity or organization; solicits individuals to engage in terrorist activity or for membership in a terrorist organization; or provides material support for the commission of a terrorist activity, to an individual who has committed or plans to commit terrorist activity, or to a terrorist organization.

(Dkt. 34 ¶ 44 (summarizing 8 U.S.C. § 1182(a)(3)(B)(iv)).)[1]

The INA gives the Executive Branch authority to exempt some visa applicants from TRIG. The statute provides:

The Secretary of State, after consultation with the Attorney General and the Secretary of Homeland Security, or the Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, may determine

---

[1] The INA defines "terrorist activity" to include "violent activities such as hijacking or sabotage of conveyances; seizing or detaining, and threatening to kill, injure, or continue to detain, another individual to compel a third person to do or abstain from doing any act as an explicit or implicit condition for the release of the individual; violent attacks upon internationally protected persons; assassination; the use of any biological agent, chemical agent, or nuclear weapon or device, or explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain) with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property; and a threat, attempt, or conspiracy to do any of the foregoing." (Dkt. 59-1 at 5 (summarizing 8 U.S.C. § 1182(a)(3)(B)(iii)).)

> in such Secretary's sole unreviewable discretion that subsection (a)(3)(B) shall not
> apply with respect to an alien within the scope of that subsection or that subsection
> (a)(3)(B)(vi)(III) shall not apply to a group within the scope of that subsection[.]

8 U.S.C. § 1182(d)(3)(B)(i). In other words, the Secretaries of State and Homeland Security may

exempt an individual from TRIG and thus allow that person to obtain a visa (an "individual" or

"situational" exemption), and the Secretaries may decide that a particular group is not a Tier III

terrorist organization within the meaning of Section 1182(a)(3)(B)(vi)(III) (a "group-based

exemption). *Id.*; (*see also* dkt. 34 ¶ 48; dkt. 59-1 at 5–6). Such exemptions are typically

published in the Federal Register. (Dkt. 34 ¶ 48 (citing *Terrorism-Related Inadmissibility*

*Grounds Exemptions*, USCIS, https://perma.cc/79DY-4PRW (last updated July 13, 2022)).)

Although the granting of such waivers is in the Secretaries' "sole unreviewable

discretion," 8 U.S.C. § 1182(d)(3)(B)(i), the INA places limits on when the Secretaries may

exercise this authority. The availability of situational exemptions is limited for individuals with

certain links to Tier I or Tier II terrorist organizations: "no such waiver may be extended to an

alien who is a member or representative of, has voluntarily and knowingly engaged in or

endorsed or espoused or persuaded others to endorse or espouse or support terrorist activity on

behalf of, or has voluntarily and knowingly received military-type training from a [Tier I or II]

terrorist organization[.]" *Id.* Additionally, Tier I and Tier II terrorist organizations are ineligible

for group-based exemptions, and no group-based exemption "may be extended to a group that

has engaged [in] terrorist activity against the United States or another democratic country or that

has purposefully engaged in a pattern or practice of terrorist activity that is directed at civilians."

*Id.*

The Secretaries have exercised their discretion to create situational and group-based

exemptions to TRIG in a number of instances relevant to this litigation. First, the March 2011

Military-Type Training Exemption (the March 2011 MTTE) allows noncitizens who received

"military-type training" from a terrorist organization to obtain visas if they received that training "under duress from, or on behalf of, a terrorist organization." Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 76 Fed. Reg. 14418 (March 16, 2011). Second, the February 2014 Insignificant Material Support Exemptions (the February 2014 IMSE) allow noncitizens who provided "insignificant" or "limited" material support to a Tier III terrorist organization to obtain a visa. *See* Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 79 Fed. Reg. 6913 (Feb. 5, 2014); Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 79 Fed. Reg. 6914 (Feb. 5, 2014). Third, the April 2019 Tier III Exemption (the April 2019 T3E), directs consular officers that "any ministry, department, agency, division, or other group or sub-group within any foreign government" shall not be considered a Tier III terrorist organization, "both retroactively and prospectively." Exercise of Authority Under the Immigration and Nationality Act, 84 Fed. Reg. 17230 (Apr. 24, 2019). This exemption does not apply "to any [Tier I terrorist organization] or any group prohibited [by statute] from benefiting from an exercise of authority … for having engaged in terrorist activity against the United States or another democratic country, or having purposefully engaged in a pattern or practice of terrorist activity that is directed at civilians." *Id.*

Fourth, the Secretary of Homeland Security published three notices creating TRIG exemptions on June 23, 2022. These include an additional Insignificant Material Support Exemption (the June 2022 IMSE), which allows noncitizens who provided "material support" to a Tier I or Tier II terrorist organization to obtain a visa if they provided only "insignificant material support (i.e., support that was minimal in amount and inconsequential in effect); or … limited material support under circumstances involving certain routine commercial transactions, certain routine social transactions (i.e., in the satisfaction of certain well-established or verifiable

family, social, or cultural obligations), certain humanitarian assistance, or substantial pressure that does not rise to the level of duress[.]" Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 87 Fed. Reg. 37523 (June 23, 2022). The two other June 23, 2022 exemptions specifically relate to allies and civil servants from Afghanistan seeking to immigrate to the United States after the Taliban resumed power in that country. *See* Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 87 Fed. Reg. 37522 (June 23, 2022) (Afghan Allies Exemption); Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 87 Fed. Reg. 37524–01 (June 23, 2022) (Afghan Civil Servants Exemption).

All these exemptions have their own sets of internal limiting criteria, and, importantly, give consular officers discretion to decide whether any particular exemption should apply to any particular visa seeker in light of the totality of the circumstances. *See* March 2011 MTTE, 76 Fed. Reg. 14418; February 2014 IMSE, 79 Fed. Reg. 6913; April 2019 T3E, 84 Fed. Reg. 17230; June 2022 IMSE, 87 Fed. Reg. 37523.

## II.      **Status of the IRGC**

The Secretary of State designated the IRGC as a Foreign Terrorist Organization under 8 U.S.C. § 1189 on April 15, 2019. *See* In re Designation of the Islamic Revolutionary Guard Corps (and Other Aliases) as a Foreign Terrorist Organization, 84 Fed. Reg. 15278–01 (Apr. 15, 2019). Making this designation required the Secretary to conclude, based on an assembled Administrative Record, both that the IRGC either engages in or "retains the capability and intent to engage in terrorist activity" as defined by the INA[2] or "terrorism" as defined by 22 U.S.C.

---

[2] *See* definition of "terrorist activity" *supra* note 1.

7

§ 2656f(d)(2),[3] and that the IRGC's terrorist activity or terrorism "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1), (3). Furthermore, application of the general legal background described above means that although the IRGC was not formally designated as a Tier I FTO until April 2019, consular officers may nevertheless determine that the IRGC acted as a Tier III terrorist organization prior to April 2019. As a consequence—before considering whether any TRIG exemptions apply—visa applicants who served in the IRGC after April 15, 2019 are generally inadmissible, and applicants who served prior to that date may be inadmissible if consular officials determine that the IRGC was a Tier III terrorist organization at the time of their service.

### III.    Named Plaintiffs' Experiences

The named plaintiffs in this case include family-based immigrant visa applicants, their U.S. citizen or legal permanent resident family members, and employment-based immigrant visa applicants. The family-based visa applicant plaintiffs are Afshin Bahiraei, Peyman Haghgooie, Saeed Amini, and Shahriar Yamrli. The U.S. citizen and legal permanent resident plaintiffs are Sarah Vosseteig (Bahiraei's wife), Tahereh Ebrahim (Haghgooie's mother), Marjaneh Mohammadi Pouya (Amini's wife), and Aynaz Mozafari (Yamrli's wife). The employment-based immigrant visa applicants are Mohammad Asad Zadeh, Mohamadreza Momayezi, and Daghigh Kia.

The visa applicant plaintiffs all had essentially the same experience attempting to obtain immigrant visas. All are Iranian citizens who were involuntarily conscripted into the IRGC and completed this mandatory military service before the IRGC was designated a Tier I FTO in April 2019. (Dkt. 34 ¶¶ 80–83, 100–01, 113–14, 124, 131–32, 139–42, 149–51.) Plaintiffs sought to

---

[3] 22 U.S.C. § 2656f(d)(2) defines "terrorism" as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents[.]"

obtain immigrant visas to live in the United States and as part of this process attended immigrant visa interviews at various U.S. consulates. (*Id.* ¶¶ 86–91, 102–06, 115–18, 125–27, 133–35, 143–44, 152–53.) Following completion of these interviews, consular officers issued plaintiffs temporary refusals of their visa applications, and some months later plaintiffs received formal notice that their visa applications had been refused pursuant to TRIG. (*Id.* ¶¶ 92–94, 106–07, 118–19, 127–28, 135, 144–46, 153–54.) After publication of the June 2022 IMSE, plaintiffs took steps to seek reconsideration of the visa applications or otherwise inquire as to their eligibility under this exemption, but consular officers either denied or did not respond to all such requests. (*Id.* ¶¶ 95–98, 108–11, 120–21, 129, 136–37, 155–56.) As a result, the U.S. citizen and legal permanent resident plaintiffs cannot reside in the United States with their visa-applicant family members, and the employment-based visa applicant plaintiffs were unable to accept offers of employment in the United States. (*Id.* ¶¶ 99, 112, 122, 130, 138, 147, 157–58.)

## IV.   **Procedural History**

Plaintiffs initially filed this lawsuit in December 2022, but the Second Amended Complaint, filed in April 2023, is the operative pleading before the court. (*See* dkts. 1, 34.) This class action complaint filed on behalf of plaintiffs and similarly situated individuals names USCIS, the Director of USCIS, various consular officers, and the Secretaries of State and Homeland Security as defendants (all in their official capacities). (Dkt. 34.) Plaintiffs seek declaratory and injunctive relief and have filed motions for class certification, a preliminary injunction, and an evidentiary hearing. (Dkts. 43, 46, 70.) In response, the government moves to dismiss certain claims for lack of standing and the entire complaint for failure to state a claim. (Dkt. 59.)

## LEGAL STANDARDS

### I.    Rule 12(b)(1) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge the court's subject-matter jurisdiction. As the party seeking to have its case heard in federal court, the plaintiff "bears the burden of demonstrating that the district court has subject-matter jurisdiction over [the] case[.]" *Thornley* v. *Clearview AI, Inc.*, 984 F.3d 1241, 1244 (7th Cir. 2021) (citing *Schur* v. *L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 758 (7th Cir. 2009)). If the court determines that it lacks subject-matter jurisdiction, then "the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### II.   Rule 12(b)(6) Motion to Dismiss

A motion under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  In ruling on 12(b)(6) motions, the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Taha* v. *Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020). However, a plaintiff "can plead himself out of court by pleading facts that show that he has no legal claim[,]" or, put differently, "when it would be necessary to contradict the complaint in order to prevail on the merits." *Epstein* v. *Epstein*, 843 F.3d 1147, 1150 (7th Cir. 2016)

(cleaned up). Thus, "[i]f the plaintiff voluntarily provides unnecessary facts in her complaint, the defendant may use those facts to demonstrate that she is not entitled to relief." *Tamayo* v. *Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (citations omitted).

## <u>ANALYSIS</u>

The Second Amended Complaint brings a variety of legal claims: violations of the doctrine promulgated in *United States ex rel. Accardi* v. *Shaughnessy*, 347 U.S. 260 (1954), and subsequent cases requiring administrative agencies to follow their own procedures and regulations (Counts I–III); violation of the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.* (Count IV); violation of the U.S. citizen and legal permanent resident plaintiffs' substantive due process right to family unity (Counts V); violation of the employment-based visa applicant plaintiffs' procedural due process rights (Count VI); application for writ of mandamus (Count VII); and various requests for declaratory judgment (Counts IX–XI). (Dkt. 34). Despite the variety of legal theories represented by these claims, each is merely a different route to try to reach the same destination. Plaintiffs want the court to oversee consular officers' consideration of immigrant visa applications from former IRGC members, make categorical adjudications regarding when former IRGC members should be considered members of a terrorist organization and when the Secretaries' exercises of discretion apply, invalidate past consular consideration of plaintiffs' visa applications as "arbitrary, capricious … or otherwise not in accordance with the law[,]" and order defendants "to reopen proceedings, reconsider decisions, or otherwise re-adjudicate applications regarding inadmissibility under [TRIG] in accordance with … this Court's order in this lawsuit." (*Id.* at 54–55.) Although plaintiffs have standing to bring these claims, the doctrine of consular nonreviewability clearly requires dismissal of this lawsuit.

I.    **Standing**

The government begins by challenging plaintiffs' standing to litigate the claims alleged in the Second Amended Complaint. Standing doctrine reflects the constitutional requirement that the judicial power only extends to actual "cases" or "controversies." U.S. Const. art. III., § 2. Bringing a case in federal court therefore requires a plaintiff to have "a 'personal stake' in the case." *TransUnion LLC* v. *Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines* v. *Byrd*, 521 U.S. 811, 819 (1997)) (cleaned up). At its core, standing requires that a plaintiff have suffered, or be likely to suffer, an "injury in fact." *Lujan*, 504 U.S. at 560. To establish standing, a complaint must plausibly allege "an invasion of a legally protected interest," *Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560), that "(1) is concrete and particularized, (2) was or will be caused by the defendant, and (3) likely will be remedied by a favorable judgment[,]" *Brown* v. *Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (citing *Lujan*, 504 U.S. at 560–61.[4] Standing must be established for each claim a party brings, *see DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332, 352 (2006); *Johnson* v. *Office of Pers. Mgmt.*, 783 F.3d 655, 661 (7th Cir. 2015), but every plaintiff need not have standing for the court to have jurisdiction. Instead, "[w]here at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Ezell* v. *City of Chi.*, 651 F.3d 684, 696 n.7 (7th Cir. 2007) (citations omitted).

The government contends that "the court should dismiss certain claims" for lack of standing. (Dkt. 59-1 at 13.) The government supports this position by making three broad arguments: (1) "The visa-applicant plaintiffs seeking admission lack standing because they have

---

[4] To be concrete, an injury need not be tangible, but it must be "real, and not abstract." *Spokeo*, 578 U.S. at 340 (cleaned up). To be particularized, "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

no right to entry and thus no injury"; (2) "The visa-applicant Plaintiffs are unable to demonstrate Defendants refused to consider them for the June 2022 IMSE because all of the visa-applicant Plaintiffs were refused visas *before* the June 2022 IMSE existed"; and (3) "The named plaintiffs lack standing to advance the interests of unnamed U.S. companies." (*Id.* at 14, 16–17.) These arguments are unpersuasive and provide no basis for the court to conclude that plaintiffs lack standing to bring any of the claims alleged in the Second Amended Complaint.

## A.    Visa-Applicant Plaintiffs

First, the government's argument that the visa-applicant plaintiffs have no injury-in-fact because "foreign nationals seeking admission have no constitutional right to entry" has been squarely rejected by the Seventh Circuit. (*Id.* at 14 (quoting *Trump* v. *Hawaii*, 138 S. Ct. 2392, 2419 (2018)).) As the court of appeals recently confirmed in a case with almost identical facts to this one, visa-applicant plaintiffs "have standing to assert their claims … because consular officers denied visas to … them (thereby inflicting injury in fact, caused by the officer's decision, and redressable by mandamus)." *Pak* v. *Biden*, No. 23-1392, --- F.4th ----, 2024 WL 358034, at *3 (7th Cir. 2024); *see also Matushkina* v. *Nielsen*, 877 F.3d 289, 293 (7th Cir. 2017) ("A right of entry … is not a prerequisite to standing in the case of someone seeking entry to the United States."). Substantive doctrines such as consular nonreviewability may prevent a plaintiff seeking review of a visa denial from asserting a viable claim for relief, but the Seventh Circuit does not treat such doctrines as jurisdictional. *See Matushkina*, 877 F.3d at 292–97, 294 n.2 ("We treat the doctrine of consular nonreviewability as a matter of a case's merits rather than the federal courts' subject matter jurisdiction."); *Morfin* v. *Tillerson*, 851 F.3d 710, 711 (7th Cir. 2017) (limited judicial review of visa decisions under APA "is no more a limit on subject-matter jurisdiction than are doctrines of absolute and qualified immunity, statutes of limitations, and

many other rules that prevent courts from deciding whether the defendant acted properly")
(quoting *Builders Bank* v. *FDIC*, 846 F.3d 272, 275 (7th Cir. 2017)). Consistent with such
precedent, the visa-applicant plaintiffs have standing to proceed before this court.

**B.      June 2022 IMSE**

Second, the government's argument that plaintiffs lack standing for claims relating to the
June 2022 IMSE because their visa applications were denied prior to June 2022 misunderstands
plaintiffs' complaint. Plaintiffs, except for Momayezi and Kia, allege that they sought
reconsideration of their visa refusal decisions following publication of the June 2022 IMSE.
(Dkt. 34 ¶¶ 95–96, 110–11, 120–21, 129, 136.) Of these requests for reconsideration, those made
by Bahiraei/Vosseteig and Yamrli/Mozafari came within one year of the formal refusal of their
visa applications. (*Id.* ¶¶ 93, 95–96, 128–29.) Federal regulation explicitly provides that, "[i]f a
visa is refused, and the applicant within one year from the date of refusal adduces further
evidence tending to overcome the ground of ineligibility on which the refusal was based, the case
shall be reconsidered" and "an additional application fee shall not be required." 22 C.F.R.
§ 42.81(e). As Bahiraei/Vosseteig and Yamrli/Mozafari appear to have clearly acted within the
scope of this regulation by seeking reconsideration when they did, the renewed refusal in
Bahiraei's case and the failure to respond in Yamrli's case create further injuries distinct from
the initial visa refusals. (*See* dkt. 34 ¶¶ 96, 129.) Thus, while the government is correct that
"Defendants did not fail to consider the visa-applicant Plaintiffs for the June 2022 IMSE because
the exemption did not exist at the time their applications were decided" (dkt. 59-1 at 16), two of
the plaintiff families allege that consular officers failed to take the June 2022 IMSE into account
when reconsidering Bahiraei and Yamrli's applications following publication of that exemption.
Such injury is traceable to defendants, and Bahiraei, Vosseteig, Yamrli, and Mozafari have

standing to pursue claims regarding application of the June 2022 IMSE. As a result, the court may exercise subject-matter jurisdiction over plaintiffs' claims regarding the June 2022 IMSE. *See Ezell*, 651 F.3d at 696 n.7.

## C. Unnamed U.S. Companies

Finally, the government's argument that "[t]he named plaintiffs lack standing to advance the interests of unnamed U.S. companies" is more accurately characterized as a challenge to the scope of plaintiffs' proposed class and the ability of the named plaintiffs to represent that class than an argument to dismiss claims for lack of standing. The government objects to plaintiffs' inclusion of "'U.S. companies' generally in their global class definition and subclasses C and C1" (dkt. 59-1 at 17 (citing dkt. 34 ¶¶ 33–35)), and to plaintiffs' assertion that defendants "refus[ed] to accept documentary evidence supporting exemption status claims from … U.S. employers who petitioned for their beneficiaries" (*id.* (quoting dkt. 34 ¶¶ 210, 214, 220)). The government then makes the leap that because plaintiffs Asad Zadeh, Momayezi, and Kia sought employment-based immigrant visas, those plaintiffs seek to assert claims on behalf of "U.S. companies" rather than on their own behalf. Confusingly, plaintiffs accept this interpretation (*see* dkt. 66 at 21–22), even though the complaint contains no language suggesting that any claim is brought *on behalf of* a U.S. company or employer (rather than *by* a U.S. company as a class member should the court certify the proposed class).

Good reasons may exist for the court not to permit plaintiffs to include "unnamed U.S. companies" in their class definitions or allow the named plaintiffs to serve as class representatives of a class that includes corporate entities. But at this stage of the litigation, the court has not yet certified any class—and because "[c]ertification has not been granted, … the named plaintiffs are the only members of the putative class" before the court. *Sherwood* v.

*Marchiori*, 76 F.4th 688, 697 (7th Cir. 2023). At this pre-certification stage of the litigation, the court asks only whether the named plaintiffs have standing to bring the claims alleged in the complaint. *See Morlan* v. *Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002) ("[U]ntil certification, the jurisdiction of the district court depends upon its having jurisdiction over the claim of the named plaintiffs when the suit is filed and continuously thereafter until certification, … because until certification there is no class action but merely the prospect of one; the only action is the suit by the named plaintiffs.") (citations omitted). No company is a named plaintiff in the complaint, and all three of the employment-based visa plaintiffs sue on their own behalf rather than on behalf of their potential U.S. employers. And as explained above, these visa-applicant plaintiffs have standing to proceed. Whatever the merits of the government's argument regarding "unnamed U.S. companies," that argument provides no basis for dismissing any claims under Federal Rule of Civil Procedure 12(b)(1).

## II.     Doctrine of Consular Nonreviewability

Although plaintiffs have standing to present their case in federal court, the doctrine of consular nonreviewability clearly requires dismissal of their claims.[5] "'Consular nonreviewability' is the general rule that decisions 'to issue or withhold a visa' are not reviewable in court 'unless Congress says otherwise.'" *Matushkina*, 877 F.3d at 294 (quoting *Saavedra Bruno* v. *Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999)). Because "Congress has delegated the power to determine who may enter the country to the Executive Branch, and courts generally have no authority to second-guess the Executive's decisions[,]" *Yafai* v. *Pompeo*, 912 F.3d 1018, 1020 (7th Cir. 2019) (citing *Kleindienst* v. *Mandel*, 408 U.S. 753, 769–70 (1972)),

---

[5] Defendants also make numerous other arguments for dismissal on the merits. Because the doctrine of consular nonreviewability bars plaintiffs' claims, however, the court does not reach these other issues presented in the parties' briefs.

"consular nonreviewability creates a 'general norm of nonreviewability[,]'" *Matushkina*, 877 F.3d at 294 (quoting *Hazama* v. *Tillerson*, 851 F.3d 706, 708 (7th Cir. 2017)). As a result, "[t]he doctrine bars judicial review of visa decisions made by consular officials abroad." *Id.* (citing *Saavedra Bruno*, 197 F.3d at 1159). Moreover, the doctrine applies "even to suits where a plaintiff seeks to challenge a visa decision indirectly." *Id.* at 295 (collecting cases). "Courts are not required to take a plaintiff's word that she is not challenging the visa denial[,]" *id.*, and "Plaintiffs cannot shield their claims from the doctrine of consular nonreviewability by 'repackaging [their] substantive complaints as procedural objections.'" *Pak*, 2024 WL 358034 at *3 (quoting *Doe* v. *McAleenan*, 926 F.3d 910, 911 (7th Cir. 2019)).

Only a narrow exception to this rule exists. A plaintiff may seek judicial review "when the visa denial implicates a constitutional right of an American citizen[,]" provided that "a court may not disturb the consular officer's decision if the reason given is 'facially legitimate and bona fide'" and not made in bad faith. *Yafai*, 912 F.3d at 1021–22 (quoting *Mandel*, 408 U.S. at 769). In conducting this "limited review," courts "do not look to see whether a consular official properly construed and applied relevant provisions of law." *Matushkina*, 877 F.3d at 294. Instead, courts "look at the face of the decision, see if the officer cited a proper ground under the statute, and ensure that no other applicable constitutional limitations are violated. Once that is done, if the undisputed record includes facts that would support that ground, our task is over." *Id.* (quoting *Hazama*, 851 F.3d at 709). Furthermore, "[w]hen a statute 'specifies discrete factual predicates that the consular officer must find to exist before denying a visa,' the citation of the statutory predicates is itself sufficient." *Yafai*, 912 F.3d at 1021 (quoting *Kerry* v. *Din*, 576 U.S. 86, 105 (2015) (Kennedy, J., concurring)). As a result, "the consular officer need not disclose the

underlying facts that led him to conclude that the statute was satisfied." *Id.* (citing *Din*, 576 U.S. at 105; *Mandel*, 408 U.S. at 770).

A court may only "engage in more searching review of a facially legitimate and bona fide decision if the plaintiffs make an affirmative showing that the decision was made in bad faith." *Id.* at 1022. Although "[i]t is unclear how much latitude—if any—courts have to look behind a decision that is facially legitimate and bona fide to determine whether it was actually made in bad faith[,]" making such a showing at least "requires a plaintiff to point to something more than an unfavorable decision."[6] *Id.* A plaintiff can meet this burden by presenting evidence that "any kind of improper bias, dishonest belief, or 'illicit motive' lay behind the consular officers' decisions." *Pak*, 2024 WL 358034 at *5. Additionally, a court "might be able to infer bad faith 'if [an applicant] had presented strong evidence ... that the consular officer refused to consider.'" *Id.* (quoting *Morfin*, 851 F.3d at 713–14). A plaintiff challenging a visa denial may survive a motion to dismiss if such an "affirmative showing of bad faith" is "plausibly alleged with sufficient particularity" in the complaint. *Pak*, 2024 WL 358034 at *5 (quoting *Din*, 576 U.S. at 105 (Kennedy, J., concurring)).

As made clear in *Pak*, which considered fact patterns and legal theories essentially identical to those at issue here, plaintiffs' claims fall within the gamut of consular nonreviewability. *See Pak*, 2024 WL 358034 at *3–5. Plaintiffs' *Accardi* doctrine (Counts I, II,

---

[6] Plaintiffs cite a series of out-of-circuit cases to argue that a constitutional claim brought by a U.S. citizen is enough to overcome the doctrine of consular nonreviewability. (Dkt. 66 at 26–27 (citing *Am. Acad. of Religion* v. *Napolitano*, 573 F.3d 115, 124 (2d Cir. 2009); *Bustamante* v. *Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008); *Am. Sociological Ass'n* v. *Chertoff*, 588 F. Supp. 2d 166 (D. Mass. 2008); *Chiang* v. *Skeirik*, 529 F. Supp. 2d 166, 171 (D. Mass 2007); *Fiallo* v. *Levi*, 406 F. Supp. 162, 165 (E.D.N.Y. 1975).) But plaintiffs never explain why the court should afford these cases greater weight than more recent controlling Seventh Circuit precedent. These cases perhaps suggest a larger role for courts in determining whether consular officers have provided a "facially legitimate and bona fide" reason for denying a visa, but Seventh Circuit precedent has squarely rejected such possibility. *See Yafai*, 912 F.3d at 1021–22; *Hazama*, 851 F.3d at 709.

III), APA (Count IV), mandamus (Count VII), and declaratory judgment (Counts VIII, IX, X, XI) claims, as well as the employment-based plaintiffs' procedural due process claim (Count VI), all attack the procedures defendants have developed and implemented for processing and evaluating TRIG exemptions—but "what Plaintiffs really want is to be granted TRIG exemptions (or to have exemptions granted for their close relatives)." *Id.* at *3; (dkt. 34 at 53–55; dkt. 66 at 26–27). Because the court "cannot review a TRIG exemption determination without first assessing a consular officer's inadmissibility determination," such claims constitute an impermissible "indirect attack" on plaintiffs' visa denials. *Pak*, 2024 WL 358034 at *3. Furthermore, "Plaintiffs' choice to target the exemption process [is] particularly untenable" because "Congress left exemption determinations to the 'sole unreviewable discretion' of the Secretaries of State and Homeland Security[.]" *Id.* (quoting 8 U.S.C. § 1182(d)(3)(B)(i)). Thus, the court "must presume that [plaintiffs'] claims are unreviewable" because they "cannot be divorced from a substantive challenge to the Executive's discretionary decisions." *Id.*

That leaves the U.S. citizen plaintiffs' substantive due process claim (Count V). The Supreme Court has not clarified whether U.S. citizens have a due process right to live with their noncitizen family members. *Id.* at *4 (discussing *Din*, 576 U.S. 86). But assuming "for the sake of argument that the denials of the visa-applicant plaintiffs' applications did implicate the constitutional rights of their U.S. citizen family members[,]" the court may review the consular officers' decisions to determine if they were facially legitimate and bona fide. *Id.* The visa-applicant plaintiffs all received notice from the State Department that consular officers refused their applications pursuant to TRIG. (*See* dkt. 34 ¶¶ 93, 107, 119, 123, 128, 146, 154 (citing 8 U.S.C. § 1182(a)(3)(B)).) As explained above, TRIG provides that any noncitizen who is "a member of a terrorist organization" or who "has received military-type training … from or on

19

behalf of any organization that, at the time the training was received, was a terrorist organization" is inadmissible. *Id.* § 1182(a)(3)(B)(i)(V), (VI), (VIII). Whether a particular organization is a Tier III terrorist organization is a matter of consular discretion. (Dkt. 34 ¶ 43.) The visa-applicant plaintiffs all admit that they completed mandatory military service in the IRGC prior to its designation as a Tier I FTO in 2019. (*See* dkt. 34 ¶¶ 80, 100, 113, 124, 132, 139, 149.) Thus, on the face of each of the visa refusal decisions, the consular officers "cited a proper ground under the statute"—TRIG—and "the undisputed record includes facts that would support that ground"—military service in the IRGC, which consular officers could have concluded in their discretion was a Tier III terrorist organization at the time of service. *Matushkina*, 877 F.3d at 294. Each of plaintiffs' visa applications was therefore "denied for a bona fide and facially legitimate reason." *Matushkina*, 877 F.3d at 294; *see also Pak*, 2024 WL 358034 at *4 (concluding that a citation to TRIG provides a facially legitimate and bona fide reason for denying the visa applications of people who had served as conscripts in the IRGC).

Consequently, the U.S. citizen plaintiffs' constitutional claim only permits the court to engage in a more searching review of consular decision-making if the complaint makes plausible and sufficiently particular allegations of bad faith. *Pak*, 2024 WL 358034 at *5. The substantive due process count in the Second Amended Complaint challenges defendants' alleged refusal "to accept any documentary evidence that is submitted to support an exemption status claim" or "to take into consideration either the April 2019 T3E or the June 2022 IMSE in determining if the applicants are exempt from the TRIG[.]" (Dkt. 34 ¶ 220.) Reading the Second Amended Complaint more broadly in a manner most favorable to plaintiffs, the court can also construe it as asserting that defendants acted in bad faith by providing "misinformation" related to the June 2022 IMSE and the June 2022 Afghan Allies and Civil Servants Exemptions and by engaging

"in nationality- and religion-based discrimination[.]" (*Id.* ¶¶ 208–16.) None of these theories provides an adequate basis to establish bad faith.

First, plaintiffs fail to support their assertion that defendants refused to accept documentary evidence with adequate factual allegations. To be sure, plaintiffs allege that "[d]espite all Plaintiffs completing their mandatory military service in IRGC prior to April 19, 2019, Defendants refused to accept documentary evidence from any Plaintiff as evidence to support an exemption to the TRIG." (Dkt. 34 ¶ 163.) But plaintiffs also allege that Bahiraei and Amini tried to submit documentary evidence, and in both cases such documentation was apparently accepted by consular officials. (*Id.* ¶¶ 91–92, 120–21.) The Second Amended Complaint contains no allegations that any of the other visa-applicant plaintiffs submitted any documents regarding their IRGC service, either at the time of their initial applications or when seeking reconsideration following publication of the June 2022 IMSE. (*Id.* ¶¶ 106–11, 127–29, 135–37, 144, 146, 154–56.) Considering the inconsistent nature of these allegations, plaintiffs have at best failed to plausibly assert that consular officers refused to accept documents. *See, e.g.*, *Iqbal*, 556 U.S. at 678 (complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement'") (quoting *Twombly*, 550 U.S. at 557). At worst, plaintiffs have pleaded themselves out of court on this issue by contradicting their allegation that "Defendants refused to accept documentary evidence from any Plaintiff" with other allegations indicating that consular officers accepted documents from Bahiraei and Amini. (Dkt. 34 ¶¶ 91–92, 120–21, 163); *see Epstein*, 843 F.3d at 1150 ("A plaintiff can 'plead himself out of court by pleading facts that show that he has no legal claim.'") (quoting *Atkins* v. *City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011)). In any event, plaintiffs have not made allegations that they "presented strong

evidence ... that the consular officer refused to consider" from which the court "might be able to infer bad faith." *Pak*, 2024 WL 358034 at *5 (cleaned up).

Next, the failure to consider the April 2019 T3E or the June 2022 IMSE and the "misinformation" theories present two sides of the same coin. Plaintiffs allege that consular officers discussed the Afghan Allies and Civil Servants Exemptions when responding to Bahiraei's request for reconsideration and provided perfunctory denials when other plaintiffs inquired about their eligibility for the June 2022 IMSE. (Dkt. 34 ¶¶ 96–98, 110–11, 120–21, 129, 136–37, 155–56.) From these interactions, plaintiffs extrapolate that "Defendants do not acknowledge or recognize June 2022 IMSE exemption, nor any other exemption aside from the Afghani Civil Servant Exemption." (*Id.* ¶ 164.) Thus, plaintiffs challenge defendants' failure to apply the April 2019 T3E or the June 2022 IMSE and to tell visa applicants that the June 2022 IMSE exists separately from the Afghan exemptions (the alleged "misinformation"). The allegations in the Second Amended Complaint, however, provide no basis for inferring from the fact of denial (of both the initial application and subsequent requests for reconsideration) that defendants failed to consider the April 2019 T3E or the June 2022 IMSE. Indeed, plaintiffs' factual allegations are entirely consistent with the alternative explanation that the reviewing consular officers considered the April 2019 T3E and the June 2022 IMSE but concluded in their discretion that they did not apply to plaintiffs' circumstances. As such, plaintiffs have not plausibly alleged that defendants acted in bad faith by failing to consider the April 2019 T3E and the June 2022 IMSE. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief") (cleaned up).

As for the "misinformation" theory, the discussion with Bahiraei of the Afghan Allies and Civil Servants Exemptions came after he asked about his eligibility for the "June 23, 2022 exemptions" without specifying the June 2022 IMSE in particular. (Dkt. 34 ¶¶ 95–98.) As all three exemptions were published on June 23, 2022, it is unsurprising that Bahiraei would receive a response discussing the Afghan-specific exemptions. Furthermore, the consular officer's response to Bahiraei's inquiry made clear that "The *exemptions* published recently in the Federal Register notices are not applicable to people who have received military-type training from Foreign Terrorist Organizations, including IRGC conscripts." (*Id.* ¶ 96 (emphasis added).) The use of the plural "exemptions" can only reasonably be read as referencing the three exemptions published in the Federal Register on June 23, 2022, including the June 2022 IMSE. As a result, plaintiffs have not plausibly alleged that defendants either misinformed plaintiffs "that the June 2022 IMSE exemption is only available to Afghan nationals" or misled plaintiffs "by stating [that] the Afghan Civil Servant exemption did not apply when asked about the June 2022 IMSE exemption." (*Id.* ¶ 213). No factual basis therefore exists for the court to infer bad faith from "misinformation" provided by defendants.

Finally, the Second Amended Complaint points to no allegations in support of plaintiffs' discrimination theory. Merely making the conclusional assertion that defendants "have engaged in nationality- and religion-based discrimination and failed to uphold statutory rights guaranteed by the INA" is plainly insufficient to state a claim for relief. (Dkt. 34 ¶ 211); s*ee Twombly*, 550 U.S. at 555 (pleading must contain more than "labels and conclusions" to state a claim). Plaintiffs try to add greater factual detail supporting this assertion in their opposition to the motion to dismiss, introducing a statement by USCIS Director Ur Jaddou that "[t]he use of the [June 2022 IMSE] for IRGC conscripts or affiliates is not anticipated at this time." (Dkt. 66 at 43

(quoting Letter from Ur Jaddou, Director, USCIS, to Bill Hagerty, United States Senator (Oct. 21, 2022) (available at https://perma.cc/XN7F-V6CC)).) Plaintiffs then contend that this refusal to apply the June 2022 IMSE to former IRGC members constitutes clear discrimination "based on … nationality and political agenda." (*Id.* at 44.) But the court cannot consider this new evidence "because of the axiomatic rule that a plaintiff may not amend his complaint in his response brief." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust* v. *Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011).

Even if the court were to consider the Jaddou Letter, however, it does nothing to bolster plaintiffs' argument. The statement from Jaddou quoted by plaintiffs goes on to explain that the June 2022 IMSE "is only available to exempt the provision of material support under limited criteria and does not exempt the applicability of other TRIG violations, such as individuals who are a current member of a terrorist organization, received military-type training from a terrorist organization, or committed a terrorist activity." (*Id.* at 43 (quoting Jaddou Letter).) Far from suggesting an improper discriminatory motive, the Jaddou Letter indicates that visa applicants who were conscripted to serve in the IRGC have not benefited from the June 2022 IMSE because of how the government understands that exemption to interact with other related statutory and regulatory provisions. Reasonable minds can disagree about whether defendants' interpretation is correct, but the law ultimately gives the government discretion to adopt the interpretation of its choosing without judicial intervention. *See Hazama*, 851 F.3d at 709 (Consular nonreviewability does not permit courts to "examine whether the officer 'properly construed and applied' the relevant provisions of law."). It is not evidence of bad faith that the government picked an interpretation that benefits plaintiffs less than other possible interpretations. A discriminatory bad faith argument might succeed if plaintiffs could show that the government adopted a less helpful

interpretation due to "any kind of improper bias, dishonest belief, or 'illicit motive[,]'" *Pak*, 2024 WL 358034 at *5, but such factual allegations are not present here. In short, therefore, plaintiffs have not "plausibly alleged with sufficient particularity" any facts from which the court can infer bad faith, and consular nonreviewability requires the court to dismiss plaintiffs' claims.

## CONCLUSION AND ORDER

For the foregoing reasons, the government's motion to dismiss (dkt. 59) is granted, and plaintiffs' motions for class certification, a preliminary injunction, and evidentiary hearing (dkts. 43, 46, 70) are accordingly denied as moot. The dismissal is without prejudice. To the extent that plaintiffs believe their experiences create valid claims for relief, they have until March 7, 2024, to replead. To be clear, the court will not permit any claims to go forward that ask it to interpret or apply TRIG or any TRIG exemptions in the context of visa applications, as the doctrine of consular nonreviewability protects such discretionary decision-making from court oversight.

Finally, in reaching this decision, the court is not lacking in compassion for plaintiffs' circumstances. This ruling in no way reflects judgment on the visa-applicants' character or moral fitness to become upstanding and law-abiding permanent residents and citizens. The law simply gives judges essentially no role in the visa decision process, while also making it very difficult for anyone who served in the IRGC to obtain an immigrant visa to the United States. Whether this latter policy should change is beyond the competency of courts to decide.

Date: February 15, 2024

_____
U.S. District Judge Joan H. Lefkow